Opinion issued March 9, 2007















Opinion issued March 9, 2007

            

                                                

 



     

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

____________

 

NO. 01-03-01357-CV

____________

 

DOUGLAS A. MURPHY, Appellant

 

V.

 

AMERICAN RICE, INC., Appellee

 

 

 



On Appeal from the 157th District Court

Harris County, Texas

Trial Court Cause No. 99-51044

 

 

 



MEMORANDUM  OPINION

              Appellant,
Douglas A. Murphy, appeals from a final judgment, rendered upon a jury verdict
and upon trial-court determination, of $4,404,171 in actual damages and $10
million in exemplary damages rendered against him and in favor of appellee,
American Rice, Inc. (“ARI”).[1] 
We determine (1) whether Murphy has not properly presented certain of
his appellate challenges for having raised them only in his reply brief; (2)
whether ARI had standing to assert all or part of the causes of action for
which it sued Murphy and, if not, whether reversal is required; (3) whether
Murphy preserved his jury-charge-error challenges; (4) whether legally
sufficient evidence supported the jury’s findings on liability and actual
damages against Murphy for conspiracy; and (5) whether the trial court erred in
awarding the exemplary damages that it did. 
We affirm.

Background

              ARI
was originally an agricultural cooperative formed by rice farmers to market,
and later to process, rice.  ARI became a
publicly traded corporation in 1988.

              In
1986, ARI formed a joint venture with Comet Rice (“Comet”).[2] 
At the time, Murphy was the chief executive officer of Comet.  The joint venture between Comet and ARI was
called Comet American Marketing (“CAM”).  CAM was
formed to market ARI and Comet rice brands. 
Murphy was CAM’s president.  C. Bronson Schultz was CAM’s
financial officer.  Murphy became a board
member of ARI in the late 1980s, and he later became ARI’s president in 1993
and eventually its chief executive officer. 
Pursuant to the ARI–Comet joint-venture agreement, CAM obtained ARI’s
and Comet’s rice, which CAM then sold on credit to a distributor, Best
Beverage, for distribution in Haiti.  After Best Beverage defaulted in the amount
of about $3,000,000, a company named Rice Corporation of Haiti (“RCH”) was formed to process and to
market CAM’s rice.  The ownership of RCH was at the heart of this
lawsuit.

              The
parties’ evidence diverged on how and for whom RCH was formed.  According to ARI’s evidence, after Best
Beverage had defaulted, Comet decided to run its own Haitian rice
operation.  The intention was for Comet
(or CAM: the testimony conflicted on that
point) to own this company, which would be incorporated as RCH.  Comet sent employees to find a facility, and
they found a suitable rice mill in Laffiteau,
 Haiti.  To begin this process of incorporating a
company for Comet to run the Laffiteau facility, Murphy and Robert Papanos, CAM’s
director of Carribean sales, met, on behalf of Comet or CAM (the testimony
conflicted on that point), with lawyers at a Haitian law firm, Cabinette
Lamarre, in the late 1980s.  The Haitian
attorneys advised Murphy and Papanos that, under Haitian law, only individuals
could be shareholders.  For this reason,
Murphy and Papanos had themselves, another Comet employee (Ray Koza, CAM’s director of domestic sales), and a Haitian attorney
(Louis M. Lamarre), named as founders of RCH, with Murphy’s being named general
director.[3] 
No share certificates were yet issued.

              RCH
officially became a corporation in 1991, when certain information pertaining to
it was published in the Haitian newspaper, Le Moniteur, as required by
Haitian law.  Murphy, Papanos, Koza, and
Lamarre were listed in Le Moniteur as RCH’s shareholders and founders
and as having paid part of RCH’s initial capitalization of $20,000.  However, ARI’s evidence showed

●  that
Papanos never considered himself to be an owner of RCH and instead viewed CAM or Comet as the owner;

 

●  that
Papanos and Koza never actually paid anything for their shares;

 

●  that, at
Murphy’s instruction, Papanos had CAM wire
Cabinette Lamarre $20,000, which the factfinder could reasonably have inferred
was for RCH’s initial capitalization of $20,000;

 

●  that
Koza did not even know until 1998 that he had been named a founder and
shareholder of RCH;

 

 

 

 

●  that ARI
“would not [later] have spent $3 million on something [RCH] that [ARI did not]
own”;[4]

 

●  that
Murphy affirmatively represented multiple times—including in filings with the
Securities and Exchange Commission, in merger and debt-offering documents, in
ARI’s annual reports, in letters to shareholders or to others, and in employee
newsletters, all of which he personally signed—that RCH was the wholly owned
subsidiary of Comet or ARI, as Comet’s later successor;

 

●  that
Murphy told ARI’s counsel in 1993 that RCH was “one hundred percent beneficially
owned by Comet and that for purposes of Haitian law nominally 20 percent by a
Haitian citizen” and that Comet had “paid for” RCH; and

 

●  that
Murphy did not begin asserting that he owned RCH personally, as opposed to
nominally for Comet’s (or ARI’s) benefit, until about the time that ARI filed
for bankruptcy in 1998.

 

In sum, ARI’s evidence showed that
Comet owned RCH from RCH’s inception and that Murphy, Papanos, Koza, and
Lamarre held RCH’s stock only nominally, for the benefit of Comet or CAM.

              Murphy’s
evidence differed sharply and can be summarized, in part, as follows: he
personally paid for his shares in cash or services; any written statements that
he made to the effect that RCH was ARI’s wholly owned subsidiary were either
done unknowingly or by misunderstanding (for example, Murphy testified that he
overlooked the statements or did not read some of the documents) or were done
by others; that he had consistently claimed personal ownership of his shares in
RCH; that Koza was aware before 1998 that he was an owner of RCH; that Comet
did not own RCH merely because it had provided RCH’s start-up equipment; that
ARI and RCH treated each other as independent companies; and that ARI obtained
no ownership interest in RCH for the money that it spent on RCH.

              As
noted above, on May 23, 1993, ARI acquired all of Comet’s assets in exchange
for ARI stock.  Murphy was Comet’s
vice-president and a director at the time. 
One of the assets that Comet expressly and repeatedly acknowledged
during the transaction that it was selling to ARI was all of the shares of
capital stock that it owned in RCH, as its wholly owned subsidiary.[5] 
Murphy, as Comet’s vice-president, personally signed a closing document
containing one of those representations in the asset sale.  Given their differing positions on whether
Murphy held his stock in RCH nominally for Comet or personally, the parties
dispute whether the merger and asset acquisition actually transferred any stock
interest in RCH from Comet to ARI.

              After
the asset purchase, in the fall of 1993, ARI and RCH entered into an operating
agreement under which ARI shipped rice to RCH for RCH to process and to sell (“the
operating agreement”).  Under the
operating agreement, RCH was to receive 10 percent of the sale price of the
rice, a processing fee calculated according to the weight of rice processed,
and an unloading fee (to account for Haitian taxes).  The parties appear to have disputed below, at
least to some extent, whether ARI and RCH ever abided by or operated pursuant
to the operating agreement.

              In
1994, according to RCH’s board minutes, RCH’s shareholders changed by virtue of
assignment of “ownership right on the shares [sic] certificates that were not
yet printed and issued”: Murphy was described as owning 90 percent of RCH’s
shares; former appellant Lawrence H. Theriot, an ARI employee,[6] was described as owning five percent
of the shares; and another Haitian attorney, Emmanuel Nerette, was described as
owning five percent of the shares.

              In
1995, ARI effectuated a debt offering to pay off debt left from the 1993 merger
and asset acquisition of Comet.  In the
documents generated to effectuate the debt offering, ARI listed RCH as its
wholly owned subsidiary.  RCH was also
listed as the wholly owned subsidiary of ARI in the tax forms that ARI and its
parent corporation, ERLY, filed and on various other of ARI’s documents.  

              ARI
filed for chapter 11 bankruptcy on August 11, 1998.  The principal reasons for the bankruptcy were
(1) a March 1998 judgment against Murphy, his father, ARI, and ERLY for
millions of dollars for fraud that Murphy and his father had committed in a
business deal—the basis for ARI’s involvement being basically that Murphy’s
father had pledged his stock in ERLY in that deal (“the Tenzer judgment”);
(2) a liquidity problem due to high interest rates associated with the 1995
debt offering; and (3) problems in the Saudi Arabian market.  In the bankruptcy, ARI submitted a second
amended plan of reorganization (“the bankruptcy plan”), which the bankruptcy
court confirmed in July 1999.  The
bankruptcy plan contemplated, among other things, that ARI would incorporate a
successor company—also named ARI, but incorporated in Delaware—into which the Texas-incorporated
ARI would merge after bankruptcy. Pursuant to the confirmed bankruptcy plan,
the Delaware ARI incorporated on September 27, 1999.  The newly incorporated ARI board issued a
written consent in lieu of first board meeting on September 28, 1999, in which
the Delaware-incorporated ARI made Murphy its president.  The Texas-incorporated ARI then merged with
the Delaware-incorporated ARI on September 29, 1999, with the surviving
corporation being the Delaware-incorporated ARI.[7]  ARI came out of bankruptcy on
October 1, 1999.  

              On
October 4, 1999, ARI’s board unanimously voted to terminate, effective
immediately, Murphy’s employment with ARI and “all its subsidiaries
. . . in which [ARI] has voting control.”[8]  The board authorized and directed
Schultz to notify ARI’s subsidiaries that Murphy’s employment had been
terminated and to have Murphy removed as a signatory on “any accounts or
contractual relationships involved with such subsidiaries . . . with
which [ARI] does business, including, without limitation, [RCH].”  

              Nevertheless,
by October 6, 1999, Murphy had returned to Haiti.  Joe Schwartz, ARI’s accounting manager who
had lived in Haiti for two
years in the corporate house that ARI rented, returned to Haiti on
October 6.  An armed guard refused him
entrance to the corporate house for which ARI paid rent and advised him that
RCH had terminated the operating agreement with ARI.  ARI’s evidence showed that Theriot also
denied Schwartz entrance to the house and to RCH’s plant and sales office.  ARI could no longer control its Haitian
assets after October 6, 1999.

              ARI
sued Murphy and Theriot on October 8, 1999, based generally on their actions in
Haiti
relating to RCH in October 1999.  By the
time of trial, ARI’s “live” petition alleged the following causes of action:
monies had and received; breach of fiduciary duty and “usurpation of corporate
opportunity”; conversion; actual fraud; and constructive fraud.  ARI sought actual and exemplary damages,
including those above the exemplary-damages cap because of alleged Penal Code
violations; a declaratory judgment that “ARI owns 100% of the stock of RCH, and
that Murphy and Theriot have no ownership interest in RCH or its assets”;
attorney’s fees; and a permanent injunction “barring Murphy and Theriot from
persisting in their wrongful conduct . . . .”  Murphy answered, alleging, among other
things, that ARI had no standing to sue him because ARI “does not own any such
claims.”[9] 


              The
parties submitted ARI’s declaratory-judgment action concerning ownership of RCH
to the court.  The trial court found in
favor of ARI on that issue and entered findings of fact and conclusions of law
post-verdict.

              The
jury found, in pertinent part, as follows:

●  ARI paid
the purchase price for RCH and its assets and did not intend to make a gift of
RCH or its assets to Murphy;[10]

 

●  Murphy
failed to comply with his fiduciary duties to ARI, and 

 

a.       he
realized a “profit” of $4,344,172 from that breach and

 

b.       the
following sums of money would fairly and reasonably compensate ARI for its
damages that were proximately caused by Murphy’s breach:

 

i.        $837,747
in misappropriated funds;

 

ii.       $2,157,347
in misappropriated rice;

 

iii.      $1,409,077
in misappropriated property other than rice or cash; and 

 

iv.      $4,404,171
in “ARI’s ownership interest” that was misappropriated.[11]

 

●  Murphy
committed fraud, which the jury found by clear and convincing evidence, against
ARI and also constructively defrauded ARI, both of which frauds resulted in the
exact same categories and amounts of damages as those that the jury found for
Murphy’s breach of fiduciary duty.[12]

 

●  Murphy
converted property belonging to ARI, and that conversion resulted in the exact
same categories and amounts of damages as those that the jury found for Murphy’s
breach of fiduciary duty;[13]

 

●  Murphy
was prohibited from claiming legal title to RCH’s stock;[14]

 

●  Murphy
received $837,747 “that, in equity and good conscience, belongs to ARI”;[15]

 

 

●  Murphy
and Theriot were part of a conspiracy that damaged ARI;[16]

 

●  The harm
resulting to ARI resulted from Murphy’s malice;[17]

 

●  Murphy
and Theriot should each be assessed $20,000,000 in exemplary damages;[18] and

 

●  Murphy
committed three Penal Code offenses, which had the legal effect of removing the
cap on exemplary damages.[19]

 

              The
trial court rendered judgment on the jury’s verdict, awarding ARI $4,404,171 in
actual damages against Murphy and Theriot, jointly and severally; reducing the
exemplary-damages award to $10,000,000 against each of Murphy and Theriot;
declaring that the RCH share certificates issued to Murphy (180 of 200 shares)
and Theriot (10 of 200 shares), to the extent valid, were for the benefit of
and owned by ARI; permanently enjoining Murphy and Theriot from asserting
ownership of, rights to, or management and control over RCH or its assets and
from interfering with ARI’s ownership and rights in RCH and its assets;
ordering Murphy and Theriot to transfer and to assign (ostensibly to ARI) any
right, title, and interest that they held in RCH and its assets; and awarding
pre- and post-judgment interest.  The
trial court also entered fact findings and legal conclusions concerning the
matters on which it had ruled.  Murphy
filed motions for new trial, for judgment notwithstanding the verdict (“JNOV”),
and to disregard certain jury answers, all of which the trial court expressly
overruled.

Unchallenged Matters

              On
appeal, Murphy does not challenge the trial court’s legal conclusions, or the
fact findings supporting them, that “ARI’s ownership interest in RCH is
superior to any claim of ownership of . . . Murphy and
. . . Theriot”; that the RCH share certificates in Murphy’s and
Theriot’s names were “for the benefit of ARI”; and that Murphy and Theriot were
estopped “from claiming an ownership interest in RCH or its stock as against
the claims of ownership of ARI.”  Neither
does he challenge on appeal the jury’s findings (1) that “ARI paid the purchase
price for RCH and its assets” and (2) that Murphy and Theriot were “prohibited
from claiming legal title to the stock of RCH.” 
Murphy has also declined to challenge the final judgment’s provisions
(1) declaring that the RCH share certificates in Murphy’s and Theriot’s names
were, to the extent valid, “for the benefit of ARI”; (2) permanently enjoining
Murphy from “asserting ownership of, rights to, or management and control over
[RCH] and its assets or from interfering with the ownership and management of
and rights to [RCH] and its assets . . .”; and (3) ordering Murphy
and Theriot to “take any and all action necessary to transfer and assign any
and all right, title and interest that they hold in [RCH] and its assets
. . . .”  Accordingly, we
must take as true that Comet owned RCH from its inception; that ARI owned—through
its purchase of Comet’s assets in 1993—the stock that Murphy held in RCH; and
that RCH was thus the subsidiary of ARI.[20]

Matters Not Properly Raised

              For
the first time in his reply brief, Murphy (1) asserts that ARI’s claims are
barred by the statute of limitations; (2) raises various factual-sufficiency
challenges; (3) argues that the trial court erred in entering fact findings and
legal conclusions concerning ownership of RCH that contradicted its other legal
conclusion taking judicial notice of Haitian corporate law; and (4) asserts
that the trial court impermissibly commented on the weight of the evidence by
charging the jury in a way that allegedly assumed the truth of the disputed
fact of ARI’s ownership of RCH and its assets. 
However, these issues do not merely “address[] . . . matter[s]
in the appellee’s brief,” as the appellate rules provide for reply briefs, but
are wholly new challenges.  See Tex. R. App. P. 38.3.  Likewise, Murphy has not moved this Court to
permit amendment of his opening brief’s issues, and he has not explained why
justice requires us to consider issues that he did not timely raise and that,
in fact, he did not assert until after the cause was already set on the
submission calendar.[21] 
See Tex. R. App. P.
38.7 (“A brief may be amended or supplemented whenever justice requires, on
whatever reasonable terms the court may prescribe.”).  Under these circumstances, we do not consider
the new, substantive challenges that Murphy belatedly asserts in his reply
brief.  See Yazdchi v. Bank One, Tex.,
N.A., 177 S.W.3d 399, 404 n.18 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)
(declining to consider substantive arguments raised by appellants for first
time in reply brief).

 

Standing

              In
issue one,[22] Murphy argues that ARI did not have
standing to sue “based on conduct that occurred before it came into existence”
because (1) some of the claims that “ARI (Del) asserted in this case arose
before ARI (Del) came into existence through its incorporation on September 27,
1999” and (2) those claims thus “were owned by ARI (Tex), which, through
bankruptcy, assigned them to . . . the Indenture Trustee, in a
Confirmed Plan of Reorganization.”  Also
under issue one, Murphy argues that ARI did not have standing to sue for
misappropriation of property other than its rice because that property was
owned by RCH, ARI’s subsidiary corporation, not by ARI, RCH’s principal
shareholder.[23]

A.           Standard
of Review

              Murphy
raised at least some standing arguments akin to these in his motions for JNOV
and for new trial, but even if he had not, standing, as an element of
subject-matter jurisdiction, may be raised for the first time on appeal.  See Tex.
Ass’n of Bus. v. Tex. Air Control Bd., 852
S.W.2d 440, 445–46 (Tex.
1993). When standing is raised and considered for the first time on appeal
(and, likewise, when it is raised post-trial, as here), we “must construe the
petition in favor of the [pleading] party, and if necessary, review the entire
record to determine if any evidence supports standing.”  Id.
at 446.  

B.           The
Law of Standing

              A
plaintiff must have standing to bring a lawsuit.  Austin Nursing Ctr., Inc. v. Lovato,
171 S.W.3d 845, 848 (Tex.
2005).  “The issue of standing focuses on
whether a party has a sufficient relationship with the lawsuit so as to have a ‘justiciable
interest’ in its outcome . . . .”  Id.
(quoting 6A Charles Alan Wright, Arthur
R. Miller, & Mary Kay Kane, Fed. Prac. & Proc.: Civil § 1559, at
441 (2d ed. 1990)).  “‘A plaintiff has standing
when it is personally aggrieved, regardless of whether it is acting with
legal authority . . . .’” 
Id. (quoting Nootsie, Ltd. v.
Williamson County Appraisal Dist., 925 S.W.2d 659, 661 (Tex. 1996)) (emphasis in original).  “In Texas,
the standing doctrine requires that there be (1) ‘a real controversy between
the parties,’ that (2) ‘will be actually determined by the judicial declaration
sought.’”  Id. at 849 (quoting Nootsie,
925 S.W.2d at 662).  “Implicit in these
requirements is that litigants are ‘properly situated to be entitled to [a]
judicial determination.’” Id.
(quoting 13 Charles Alan Wright, Arthur
R. Miller, & Edward H.
Cooper, Fed. Prac. & Proc.:  Jurisdiction
§ 3531, at 338–39 (2d ed. 1984)). 

C.           Standing:
“ARI (Tex)” Versus “ARI (Del)”

              In
part of issue one, Murphy argues that ARI did not have standing to sue for
unspecified claims that “arose before ARI (Del) came into existence through its
incorporation on September 27, 1999.” 

              ARI,
as it existed before bankruptcy, was a Texas
corporation.  The bankruptcy court
confirmed the bankruptcy plan on July 6, 1999. 
As noted above, the confirmed bankruptcy plan required ARI to
incorporate a successor company in Delaware,
into which the Texas-incorporated ARI would merge after bankruptcy.  The bankruptcy plan referred to the
Texas-incorporated ARI as “Debtor” and to the Delaware-incorporated ARI as “Reorganized
Debtor.”  The bankruptcy plan defined the
Reorganized Debtor as “[t]he Debtor on or after the Effective Date, as a newly
formed Delaware
corporation pursuant to the amended ARI charter.”

              The
Delaware ARI incorporated on September 27, 1999, and the Texas-incorporated ARI
merged into the Delaware-incorporated ARI on September 29, 1999.  Under the merger agreement, all “assets,
property, rights, privileges, powers, franchises, debts, obligations,
restrictions, disabilities and duties” of the Texas-incorporated ARI vested in
the Delaware-incorporated ARI, “in accordance with and except as provided by”
the bankruptcy plan.  Likewise, the July
6, 1999 order approving the bankruptcy plan provided that

except as provided in the Plan, all assets of the
estate (“Assets”), including without limitation, all causes of action, shall
revest in the Reorganized Debtor, as of the Effective Date, free and clear of all
Claims, liens, liabilities, encumbrances, restrictions, or interests whether
contingent or liquidated, except as provided in the Plan.

 

              The
above recitations, both in the order confirming the bankruptcy plan and in the
merger agreement, reflect well-settled Texas
law that the surviving corporation in a merger generally inherits the rights
and liabilities of the merged corporation. 
See Tex. Bus. Corp. Act
Ann. art. 5.06 (Vernon 2003); Greene’s Pressure Treating & Rentals,
Inc. v. Fulbright & Jaworski, L.L.P., 178 S.W.3d 40, 44 (Tex. App.—Houston [1st Dist.] 2005,
no pet.) (“In a merger, the successor organization stands in the shoes
of prior management and continues the operations of the prior entity.  Generally, the rights and liabilities
transfer . . . .”); see also Del Code Ann. tit. 8, § 259 (2007).

              By
virtue of the merger, the Delaware-incorporated ARI inherited all of the
Texas-incorporated ARI’s rights and assets, including its causes of action,
that had not otherwise been assigned or disposed of under the bankruptcy plan.[24] 
We thus reject Murphy’s argument that “ARI (Del) could not have been
injured by pre-September 1999 conduct because it did not exist before that day.”[25] 
See id.

              We
overrule this portion of issue one.

D.           Standing:
Assignment of Claims to the Indenture Trustee

              The
question remains, however, exactly what rights of the Texas-incorporated ARI
passed to the Delaware-incorporated ARI upon merger.  

1.  Murphy’s
Arguments

              Under
another portion of issue one, Murphy argues that ARI did not have standing to
sue “based on conduct that occurred before it came into existence” because some
of its claims “were owned by ARI (Tex), which, through bankruptcy, assigned
them to . . . the Indenture Trustee, in a Confirmed Plan of
Reorganization.”  Murphy relies on the
following two bankruptcy-plan provisions in support of his position.[26] 
First, Murphy notes that the bankruptcy plan provided that, upon the “Effective
Date” of the bankruptcy plan, the indenture trustee (U.S. Trust Company of
Texas, N.A.) would receive, among other of ARI’s assets, “all Litigation
(except for Claim Objections) that is not specifically pledged to the Take Out
Lender or otherwise specifically released under this Plan
. . . .”  Second, Murphy
notes that the plan defined Litigation as

[a]ny and all claims, demands, rights, defenses, actions, causes of action, suits,
contracts, agreements, obligations, accounts, defenses, offsets, powers,
privileges, licenses and franchises of any kind or character whatsoever,
known or unknown, suspected or unsuspected, whether arising prior to, on or
after the Petition Date,[27] in contract or tort, at law or in equity, or under any
theory of law, held by the Debtor or its Estate against any person or entity . . . including but not limited to (i)
rights of setoff, counterclaim, or recoupment, and claims on contracts or
for breaches of duties imposed by law, except to the extent that such
rights would constitute, in whole or in part, the basis for Reorganized Debtor’s
objection to Claim with respect to which Reorganized Debtor has standing to
object, . . . (iv) such claims and defenses as fraud, mistake,
duress and usury . . . .

 

(Emphasis added.)  The bankruptcy plan defined the “Effective
Date” as “the 30th day following the date the Confirmation Order[28] has become a final order,” which appears to have been
sometime around September 6, 1999.[29]

2.  ARI’s
Standing to Assert Each Cause of Action

              We
consider Murphy’s standing challenge separately for each of ARI’s causes of
action.  

a.       Conversion
and Monies Had and Received

              As
revealed in its petition, ARI’s claims for conversion and monies had and
received were, by and large, based on Murphy’s actions from early October 1999
forward, when he returned to Haiti and (as one of two board members of a
three-member board acting together) refused entry to RCH by ARI’s
employee.  The evidence was undisputed
that ARI owned all of the rice held by RCH. 
The evidence, viewed in the required light,[30] also showed that the funds in both
ARI’s and RCH’s bank accounts in Haiti came from the sale of, or were for the
purchase of, ARI’s rice and were, therefore, ARI’s funds.[31] 
However, to the extent that ARI based its claims for monies had and
received and conversion on the taking of its funds from Haitian accounts on
June 23, 1999 ($300,000), July 1, 1999 ($225,208), and July 28, 1999 ($25,000),
that portion of those claims was assigned to the indenture trustee under the
bankruptcy plan because the assignment was effective in early September 1999.[32] 
Accordingly, only the indenture trustee had standing to assert a
conversion or monies-had-and-received claim based on the three account
withdrawals pre-dating the assignment’s effective date—although ARI had
standing to assert conversion and monies-had-and-received claims based on the
other misappropriations that it alleged.

b.       Breach
of Fiduciary Duty

              As
alleged in its petition, ARI’s breach-of-fiduciary-duty claim was principally
based on Murphy’s actions from October 1999 forward.  However, ARI also alleged that Murphy had
breached his fiduciary duty by “causing stock certificates to be issued in
[his] name[] in 1998 purporting to show [that he] owned stock in RCH
. . . .”  Any
breach-of-fiduciary-duty claim based on this one action was assigned to the
indenture trustee because the action predated, and thus the cause of action
arose before, early September 1999. 
Likewise, ARI alleged that Murphy’s “insistence that [he is] the owner[]
of RCH” constituted a breach of fiduciary duty. 
Because all of ARI’s witnesses who testified on the subject agreed that
Murphy first asserted his alleged ownership interest in RCH before the
effective date of the assignment to the indenture trustee, any
breach-of-fiduciary-duty claim based on his mere assertion of owning RCH (as
opposed to his misappropriating property based on that assertion) was assigned
to the indenture trustee—although ARI had standing to assert a
breach-of-fiduciary-duty claim based on the other actions post-dating the
assignment’s effective date that it alleged constituted such a breach.

c.       Actual
and Constructive Fraud

              ARI’s
fraud claims are less clear from the petition because the petition did not
specify which acts constituted actual or constructive fraud.  However, actual fraud by misrepresentation
(upon which the jury was charged) requires (1) a false, material
representation; (2) the speaker’s knowledge, at the time of the representation’s
making, of the representation’s falsity or the speaker’s reckless making of the
representation without any knowledge of the truth and as a positive assertion;
(3) the speaker’s intent that the other party will act upon the representation;
(4) the listener’s act in reliance on the representation; and (5) resulting
injury to the listener.  See In re
FirstMerit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001). 
Likewise, actual fraud by non-disclosure (upon which the jury was also
charged) occurs when “(1) a party conceals or fails to disclose a material fact
within their [sic] knowledge, (2) the party knows that the other party is
ignorant of the fact and does not have an equal opportunity to discover the
truth, (3) the party intends to induce the other party to take some action by
concealing or failing to disclose the fact, and (4) the other party suffers
injury as a result of acting without knowledge of the undisclosed fact.”  UMLIC VP L.L.C. v. T&M Sales &
Envtl. Sys., Inc., 176 S.W.3d 595, 604 (Tex. App.—Corpus Christi 2005, pet.
denied).

              From
ARI’s evidence and jury arguments, it appears that its theory was that Murphy
committed actual fraud by repeatedly acknowledging that he held RCH’s stock
only nominally (or by failing to reveal that he owned it personally, rather
than nominally) and by accepting ARI’s investments in RCH, when he was actually
waiting to assert that he owned RCH. 
Another theory that we can glean from the record was that Murphy’s
altering ARI’s board minutes and back-dating his RCH share certificates to
support his claim to own RCH—both of which acts occurred before September 1999—constituted
actual fraud by misappropriation.  Under
either theory, the cause of action for actual fraud necessarily accrued before
September 1999, and the claim was thus assigned to the indenture trustee under
the bankruptcy plan.  ARI thus had no
standing to pursue the actual-fraud claim on which it sued.

              In
contrast, ARI’s constructive-fraud claim was based on Murphy’s violation of his
fiduciary duties to ARI by misappropriating and continuing to misappropriate
ARI’s property.  Under the jury charge
and common law, “constructive fraud is the breach of some legal or equitable
duty which, irrespective of moral guilt, the law declares fraudulent because of
its tendency to deceive others, to violate confidence, or to injure public
interests.”  Archer v. Griffith, 390 S.W.2d 735, 740 (Tex. 1964). 
Evidence supporting a breach of fiduciary duty may, in appropriate
circumstances, support a constructive-fraud finding.  See Flanary v. Mills, 150 S.W.3d 785,
795 (Tex. App.—Austin 2004, pet. denied) (“The evidence that showed the breach
of fiduciary duty supports a finding of constructive fraud.”).  In light of ARI’s pleading and the trial
record, ARI’s theory of constructive fraud appears to have been co-extensive
with its claim for breach of fiduciary duty based on Murphy’s actions from
October 1999 forward.  Accordingly, this
cause of action was not assigned to the indenture trustee, and ARI had standing
to pursue it.

d.       Declaratory
Relief Concerning Ownership of RCH

              Finally,
ARI requested declaratory relief in the form of a declaration that it owned “100%
of the stock of RCH, and that Murphy and Theriot have no ownership interest in
RCH or its assets.”  Murphy asserts that
the indenture trustee was assigned the right to seek this declaration because
it was undisputed that Murphy had first asserted his alleged ownership interest
in RCH before July 6, 1999—as was also reflected in ARI’s bankruptcy disclosure
statement, which listed as a “business risk” that the ownership of RCH was
disputed.  However, ownership is an
element of conversion, which we have already held that ARI has standing to
assert to the extent that the misappropriations occurred after early September
1999.  See Green Int’l, Inc. v. Solis,
951 S.W.2d 384, 391 (Tex.
1997).  Accordingly, even if the right to
seek a declaration of ownership in RCH in the abstract was assigned to
the indenture trustee—a matter that we need not decide—ARI would still have had
standing to obtain a declaration of ownership in conjunction with the
conversion and monies-had-and-received claims that it also had standing to
pursue.[33]

3.  ARI’s
Response to Murphy’s Standing Arguments

              In
response to Murphy’s standing arguments, ARI relies on the following, italicized
provision of the bankruptcy plan (“paragraph E(3)”), which ARI claims gives it
standing to pursue all “Litigation,” even those claims assigned to the
indenture trustee:

E. Litigation.

 

1.       The
Indenture Trustee, as assignee of certain of the Debtor’s Litigation Claims
pursuant to the Plan, may commence or advance any Litigation (except Claims
Objections) following the Effective Date . . . .

 

. . .

 

3.       Unless
Litigation is expressly waived, relinquished, released, compromised or settled
in this Plan or in a Final Order, all rights with respect to such Litigation
are reserved and the Reorganized Debtor or the Indenture Trustee, as assignee
of certain of the Debtor’s Litigation Claims pursuant to the Plan, may pursue
such Litigation. 
. . . .

 

(Emphasis added.)  ARI interprets paragraph E(3) to give it “the
right to pursue Litigation if it chooses to do so,” even if that “Litigation”
was assigned to the indenture trustee.  

              We
disagree.  Under the bankruptcy plan, not
all “Litigation” was assigned to the indenture trustee: the plan expressly
excluded from that assignment “Claim Objections”[34] and any “Litigation pledged to the
Take Out Lender or otherwise specifically released under this Plan.”  By litigation “pledged to the Take Out
Lender,” the bankruptcy plan appears to have meant litigation on which a “first
priority lien and security interest” in favor of this lender existed as
consideration for its loan to ARI.  It is
this category of “Litigation” to which we interpret paragraph E(3) to refer
when it provides that ARI may pursue “such Litigation.”  That is, by providing that either ARI or the
indenture trustee may sue, paragraph E(3) does not mean that either entity may
sue for any and all claims, even those owned by the other entity.  Rather, consistent with the provision
assigning the indenture trustee certain claims, paragraph E(3) allows the
indenture trustee to sue on the claims assigned to it under the bankruptcy
plan, while allowing ARI to sue on those claims that were not assigned to the
indenture trustee under the bankruptcy plan. 
Only this reading renders consistent both the assignment provision and
paragraph E(3).  See Frost Nat’l Bank
v. L&F Distrib., Ltd., 165 S.W.3d 310, 312 (Tex. 2005) (“We
consider the entire writing and attempt to harmonize and give effect to all the
provisions of the contract by analyzing the provisions with reference to the
whole agreement.”).  ARI’s reading of
section E(3) would render meaningless the bankruptcy plan’s assignment
provision because it would allow ARI to recover on claims that it had assigned
to another in exchange for the release of claims against ARI in bankruptcy.

4.  Conclusion
Concerning Assignment of Claims to the Indenture Trustee

 

              We
hold as follows: 

●  Concerning
ARI’s claims for conversion and monies had and received:  ARI lacked standing to sue Murphy for
conversion or misappropriation of funds that were taken before early September
1999—which funds totaled $550,208.

●  Concerning
ARI’s claims for breach of fiduciary duty: 
ARI lacked standing to sue Murphy for breaches of fiduciary duty that
occurred before early September 1999, but had standing to sue Murphy for
breaches of fiduciary duty occurring after that date.

 

●  Concerning
ARI’s claim for actual fraud:  ARI lacked
standing to sue Murphy on this claim.

 

●  Concerning
ARI’s claim for constructive fraud:  ARI
had standing to sue Murphy on this cause of action.

 

●  Concerning
ARI’s request for declaratory relief concerning ownership of RCH and related
matters:  ARI had standing to assert this
request for relief.

 

 

 

              We
sustain this portion of issue one to the extent that we have held that ARI
lacked standing to assert certain claims for having assigned those claims to
the indenture trustee.  We overrule this
portion of issue one in all other respects.[35]

E.           Alleged
Standing: Ownership of RCH’s Property

              For
each cause of action, the jury awarded ARI the same actual damages for the
reasonable cash-market value of each of the following items taken by Murphy or
Theriot: (1) ARI’s funds, i.e., its monies in bank accounts ($837,747);
(2) its rice ($2,157,347); (3) its “property other than rice and cash”
($1,409,077); and (4) “ARI’s ownership interest” in RCH ($4,404,171).  Under issue two, Murphy argues that ARI, as a
mere shareholder and parent corporation of RCH, lacked standing to sue for
misappropriation of items (1) and (3) above—bank-account funds and “property
other than rice and cash”—because this property was owned by RCH, not by ARI.[36] 
Because item (4) above is merely the sum of items (1), (2), and (3),
Murphy also challenges the jury’s damages award for item (4) to the extent that
that award was based on items (1) and (3) (property allegedly owned by RCH
only).  Finally, Murphy challenges the
jury’s damages awarded for monies had and received ($837,747) because that was
the exact amount awarded for item (1) (bank-account funds); those funds
belonged to RCH, not to ARI; and ARI thus lacked standing to recover damages
for the loss of those funds.  We construe
this standing challenge of Murphy’s to relate to ARI’s standing to sue (1) for
conversion and (2) for actual damages awarded for all causes of action to the
extent that those damages included monetary awards for RCH’s property.

              We
hold that Murphy’s challenges do not go to ARI’s standing.  As for the jury’s finding on liability for
conversion and monies had and received, ownership or right to possession of
property are elements of the claims, not matters of standing.  Solis, 951 S.W.2d at 391 (“Conversion
is defined as the wrongful exercise of dominion and control over another’s
property in denial of or inconsistent with his rights.”) (emphasis added); Staats
v. Miller, 150 Tex. 581, 584, 243 S.W.2d 686, 687 (1951) (“‘The question,
in an action for money had and received, is to which party does the money, in
equity, justice, and law, belong.  All
plaintiff need show is that defendant holds money which in equity and good
conscience belongs to him.’”) (emphasis added) (quoting 58 C.J.S., Money
Received § 4a, p. 913).  That
is, ARI had standing to sue Murphy for conversion and monies had and
received, but then had the burden to prove its ownership or superior
right to possession of all properties that it claimed were wrongfully
taken.  This is especially true because
Murphy does not contest on appeal that ARI owned at least the rice at dispute
and, thus, that ARI had standing to sue him for the conversion of its
rice.  Moreover, there was disputed
evidence (which, given the jury’s 
answers, we infer that the jury believed) that all of the funds in both
ARI’s and RCH’s bank accounts in Haiti came from the sale of ARI’s
rice and were, therefore, ARI’s funds.

              The
same logic demonstrates that ARI did not lack standing to assert causes of
action for actual fraud, constructive fraud, and breach of fiduciary duty even
if it did not own some of the property for which it sought compensation.  If ARI was damaged at all (because of
ownership of rice and funds) by Murphy’s conduct, then it had standing to sue
him on the claims that it did, and whether it could recover damages for certain
matters went to proof of damages, not to whether ARI had a “‘justiciable
interest’” in the lawsuit’s outcome or was “personally aggrieved” by Murphy’s
actions.  Lovato, 171 S.W.3d at
848 (quoting 6A Charles Alan Wright,
Arthur R. Miller, & Mary Kay Kane, Fed. Prac. & Proc.: Civil §
1559, at 441 (2d ed. 1990) and Nootsie, Ltd., 925 S.W.2d at 661); Billy
B., Inc. v. Bd. of Trs. of Galveston Wharves, 717 S.W.2d 156, 158 (Tex.
App.—Houston [1st Dist.] 1986, no writ) (“[A] person has standing to sue if:
(1) he has sustained, or is immediately in danger of sustaining, some direct
injury as a result of the wrongful act of which he complains; . . .
(4) the challenged action has caused the plaintiff some injury in fact
. . . .”) (emphasis added); Nauslar v. Coors Brewing Co.,
170 S.W.3d 242, 249 (Tex. App.—Dallas 2005, no pet.) (indicating same as Billy
B., Inc. court).

              Additionally,
“[w]hether a stockholder may recover damages personally for a wrong done to the
corporation is an argument about capacity—that is, whether the stockholder has
legal authority.”  Willis v. Donnelly,
118 S.W.3d 10, 49 (Tex. App.—Houston [14th Dist.] 2003) (op. on reh’g) (citing Mackie
v. Guthrie, 78 S.W.3d 462, 465–66 (Tex. App.—Tyler 2001, pet. denied)), rev’d
on other grounds, 199 S.W.3d 262 (Tex. 2006); see Pledger v. Schoellkopf,
762 S.W.2d 145, 145–46 (Tex. 1988) (treating as matter of capacity complaint
that shareholder-plaintiff could not sue individually on causes of action
belonging to corporation).  “It is
improper for an appellant to couch such an argument in terms of standing.”  Willis, 118 S.W.3d at 49 (citing Mackie,
78 S.W.3d at 466).  Accordingly, whether
ARI, as a shareholder of RCH, could sue for damages allegedly suffered by RCH
was not a matter of standing.

              We
overrule issue two.[37] 
We do not reach the question of whether the trial court erred in denying
Murphy’s motions for new trial—in which he argued that the jury should not have
awarded ARI damages for its subsidiary’s property, but did not couch his
challenge in terms of standing to seek such damages—both because, on appeal,
Murphy complains only that ARI lacked standing (not that it lacked capacity)
and because, at trial, Murphy waived this capacity challenge.[38]

F.           Standing:
Estoppel as Basis to Preclude Standing

              Under
an unspecified issue, Murphy argues that ARI “is judicially estopped to assert
that an assignment [from the indenture trustee to it] was not required to
prosecute its claims,” i.e., ARI is estopped from claiming that it has
standing to sue.  Specifically, Murphy
argues that ARI’s having obtained an assignment of claims from the indenture
trustee in a totally separate lawsuit filed in 2000 shows that ARI knew in this
lawsuit that it needed an assignment to have standing to assert these
claims.  In that 2000 lawsuit, ARI had
sued its former landlord to recover a security deposit, and the landlord had
defended by asserting, in effect, that ARI lacked standing because the
indenture trustee had allegedly already sued the landlord on the same matter.

              Although
Murphy’s argument concerns estoppel to assert standing, it is still an estoppel
argument.  Estoppel, unlike standing,
must be alleged, prosecuted, and preserved, or it is waived.  See Tex.
R. Civ. P. 94; In re S.A.P., 156 S.W.3d 574, 577 (Tex. 2005) (“[E]stoppel
was never submitted to the jury. An unpleaded issue may be tried by consent,
but it still must be submitted to the jury. Tex.
R. Civ. P. 279.”).  Although
Murphy pleaded judicial estoppel, he raised this estoppel argument only in his
summary-judgment motion, on which the court never expressly ruled, and did not
submit the matter to the jury or again ask the trial court to rule on judicial
estoppel as a matter of law.  Even if we
could consider Murphy’s summary-judgment motion as somehow having been
implicitly overruled,[39] a denied summary-judgment motion
does not preserve this type of matter for appeal.  See Tex.
R. Civ. P. 279; United Parcel Serv., Inc. v. Tasdemiroglu, 25
S.W.3d 914, 916 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (holding
that denied summary-judgment motion on issue of preemption, being a
matter-of-law challenge, did not preserve issue for appeal); cf. Ackermann
v. Vordenbaum, 403 S.W.2d 362, 365 (Tex. 1966) (holding that one may not
challenge denial of summary-judgment motion in appeal from judgment rendered
after trial on merits).  

              We
overrule Murphy’s judicial-estoppel argument.

Jury-Charge Error

              In
issue three, Murphy argues that “the jury charge was fatally defective because,
by failing to acknowledge ARI (Del)’s lack of standing and by failing to
distinguish between ARI (Tex) and ARI (Del), it impermissibly allowed the jury
to consider irrelevant evidence that probably resulted in an improper judgment
and prejudiced Murphy’s ability to present his appeal.”  Specifically, Murphy argues as follows:

While ARI (Del)
had no standing to sue on the basis of pre-merger conduct or for the
misappropriation of property that it did not own, it arguably did have standing
to sue on the basis of post-merger conduct that affected its property, such as
the alleged misappropriation of its rice. 
However, the trial court’s failure, over Murphy’s objection, to
recognize ARI (Del)’s
lack of standing irreparably tainted all of the jury’s liability findings and
resulted in an improper judgment. 
Specifically, by refusing to distinguish ARI (Del)
from ARI (Tex), the court allowed the jury to
consider conduct for which ARI (Del) had no
standing to sue in deciding Murphy’s liability for other alleged conduct for
which ARI (Del)
arguably had standing to complain.

 

              To
preserve these jury-charge complaints, Murphy had to raise a “timely and
specific” objection to the submission of the applicable jury questions on the
ground that ARI had no standing to assert those claims.  See Crown Life Ins. Co. v. Casteel, 22
S.W.3d 378, 387, 389 (Tex. 2000) (“Crown preserved error by obtaining a ruling
on its timely objection to the question on the ground that Casteel did not have
standing to pursue [specified] claims . . . .”; also requiring
appellant’s objection to have been “timely and specific”).  

              Murphy’s
only jury-charge objection below even somewhat resembling his appellate
standing arguments occurred during the following colloquy:

My objections will be reflected in the requested
charges submitted to the Court on the matter of the alleged assignment of
causes of action to the indenture trustee . . . .[40]

Although the trial court stated that
it was marking that request refused, no proposed jury charge exists in the
record.[41] 
We thus have only Murphy’s oral statement to consider.  That oral statement was not a specific
objection that the trial court not submit specific jury questions because (1)
the Delaware-incorporated ARI had no standing to assert the Texas-incorporated
ARI’s pre-bankruptcy claims, which had allegedly been assigned to the indenture
trustee, or (2) ARI had no “standing” (or capacity) to sue for conversion of
RCH’s property or funds.  Murphy’s oral
statements do not reveal, for example, to which jury questions he objected or
to what aspects of each cause of action reflected in those questions he
objected.[42] 
Neither did his oral statement in any way mention “distinguish[ing] ARI
(Del) from ARI (Tex)” or RCH’s ownership of property. 

              And
Murphy’s mere reference to the assignment to the indenture trustee did not
render his objection sufficiently specific. 
For example, in his earlier oral motion for directed verdict, when
disagreeing with the trial court’s view that ARI’s breach-of-fiduciary-duty
claim was based on pre-bankruptcy actions, Murphy had argued that, if ARI were
indeed making such a claim (which Murphy told the trial court he did not
interpret ARI to be making), then the court would “have to broach the subject
of whether those rights or claims with respect to the breach of fiduciary
duties were assigned to the indenture trustee as part of the reorganization
plan in the bankruptcy.”  Murphy added in
passing that ARI’s claim to certain funds that it sought as damages, as well as
ARI’s claim of ownership in RCH, had probably been assigned to the indenture
trustee for their having been made or discovered pre- or mid-bankruptcy.  However, Murphy then remarked that, “[i]n any
event,” as he understood the case, ARI’s causes of action concerned Murphy’s post-bankruptcy
actions.  

              Likewise,
although Murphy had earlier moved for summary judgment on the basis that ARI “does
not own the claims asserted in this cause and has no standing to maintain or
prosecute this action against the defendants,” that same motion discussed not
only the assignment to the indenture trustee, but also that the
Texas-incorporated ARI could not prosecute claims because it no longer existed
and the Delaware-incorporated ARI could not prosecute claims because the “claims”
(without further analysis) accrued before that corporation existed.  The discussion of the bankruptcy assignment
in the pre-charge conference and the summary-judgment motion demonstrate that
Murphy’s reference to “the alleged assignment of causes of action to the
indenture trustee” could have concerned more than one jury question or
instruction, including damages or liability questions.  

              Moreover,
we have already held that ARI had standing to assert all or part of all but one
claim that went to the jury; accordingly, Murphy’s charge objection should have
specified separately how the “alleged assignment . . . to the
indenture trustee” affected each liability question.  The verbal charge-conference objection was
thus far from “specific” and did not preserve error.  See Casteel, 22 S.W.3d at 387,
389.   

              We
overrule issue three.

Legal-Sufficiency Challenges

              In
issue four, Murphy argues that there is legally insufficient evidence to
support the jury’s liability and actual-damages findings on conversion, breach
of fiduciary duty, monies had and received, actual fraud, and constructive
fraud.  He also argues that the evidence
is legally insufficient to show, by clear and convincing evidence, that he
converted ARI’s property with malice—a predicate finding to the assessment of
exemplary damages.

A.           Standard
of Review

              When
made on an evidentiary basis, rulings on motions for directed verdict and on
motions for JNOV are reviewed under the same legal-sufficiency test as are
appellate no-evidence challenges.  See City
of Keller v. Wilson, 168 S.W.3d 802, 823,
827 (Tex.
2005).  Accordingly, to determine whether
there is some evidence to support a jury’s finding and, thus, to determine
whether a trial court correctly denied a motion for JNOV or motion for directed
verdict, “we must view the evidence in a light that tends to support the
finding of disputed fact and disregard all evidence and inferences to the
contrary.”  Wal-Mart Stores, Inc. v.
Miller, 102 S.W.3d 706, 709 (Tex.
2003).  However, “‘[t]he final test for
legal sufficiency must always be whether the evidence at trial would enable
reasonable and fair-minded people to reach the verdict under review.  . . . [L]egal-sufficiency
review in the proper light must credit favorable evidence if reasonable jurors
could, and disregard contrary evidence unless reasonable jurors could not.’”  Chubb Lloyd’s Ins. Co. of Tex. v. H.C.B.
Mech., Inc., 190 S.W.3d 89, 92 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (quoting City
of Keller, 168 S.W.3d at 827).

              If
more than a scintilla of evidence supports the jury’s finding, “the jury’s
verdict . . . must be upheld.” 
Miller, 102 S.W.3d at 709. 
“[M]ore than a scintilla of evidence exists if the evidence ‘rises to a
level that would enable reasonable and fair-minded people to differ in their
conclusions.’”  Ford Motor Co. v.
Ridgway, 135 S.W.3d 598, 601 (Tex. 2004)
(quoting Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997)).  Conversely, evidence that is “‘so weak as to
do no more than create a mere surmise’” is no more than a scintilla and, thus,
no evidence.  Id.
(quoting Kindred v. Con/Chem., Inc., 650 S.W.2d 61, 63 (Tex. 1983)).  The jury is the sole judge of witnesses’
credibility, and it may choose to believe one witness over another; a reviewing
court may not impose its own opinion to the contrary.  City of Keller, 168 S.W.3d at 819.  Because it is the jury’s province to resolve
conflicting evidence, we must assume that jurors resolved all conflicts in
accordance with their verdict.  Id. at 819–20. 

              In
conducting a legal-sufficiency review of a jury finding made on clear and
convincing evidence (such as malice), we employ an elevated standard of review:

     In a legal
sufficiency review, a court should look at all the evidence in the light most
favorable to the finding to determine whether a reasonable trier of fact could
have formed a firm belief or conviction that its finding was true.  . . .

 

If, after conducting its legal sufficiency review of
the record evidence, a court determines that no reasonable factfinder could
form a firm belief or conviction that the matter that must be proven is true,
then that court must conclude that the evidence is legally insufficient. 

 

Southwestern Bell Tel. Co. v. Garza, 164 S.W.3d 607, 627 (Tex. 2004) (quoting In re J.F.C., 96 S.W.3d 256,
266 (Tex.
2002)) (considering legal-sufficiency review of jury finding—malice—made upon
clear and convincing evidence).  We still
“review all the evidence in the light most favorable to the jury’s finding,
taking into account contrary undisputed facts” in this determination.  Qwest Int’l Comms., Inc. v. AT&T Corp.,
167 S.W.3d 324, 326 (Tex.
2005) (citing Garza, 164 S.W.3d at 619)).

              When
a party in a civil case raises a proper objection to an improper jury charge or
instruction, we measure the sufficiency of the evidence against the jury charge
or instruction that should have been given. 
See St. Joseph Hosp. v.
Wolff, 94 S.W.3d 513, 530 (Tex.
2002).  However, if no objection is made,
or if an incorrect objection is made, we measure the sufficiency of the
evidence against the jury charge or instruction actually given.  See id.

B.           Legal-Sufficiency
Challenges to Liability Findings

              We
begin with Murphy’s legal-sufficiency challenge to the jury’s finding that he
and Theriot were part of a conspiracy that damaged ARI.  In issue six, Murphy argues that the evidence
was legally insufficient to show that he was liable to ARI for having conspired
with Theriot because there is legally insufficient evidence that Murphy
committed any underlying tort on which a conspiracy could have been based.

 

              “Civil
conspiracy, generally defined as a combination of two or more persons to
accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful
means, might be called a derivative tort” because the “defendant’s liability
for conspiracy depends on participation in some underlying tort for which the
plaintiff seeks to hold at least one of the named defendants liable.”  Tilton v. Marshall, 925 S.W.2d 672,
681 (Tex.
1996) (emphasis added).  The elements are
“(1) two or more persons; (2) an object to be accomplished; (3) a meeting of
the minds on the object or course of action; (4) one or more unlawful, overt
acts; and (5) damages as a proximate result.” 
Tri v. J.T.T., 162 S.W.3d 552, 556 (Tex. 2005). 
“[C]ivil conspiracy ‘came to be used to extend liability in tort . . .
beyond the active wrongdoer to those who have merely planned, assisted, or
encouraged his acts.’”  Carroll v.
Timmers Chevrolet, 592 S.W.2d 922, 925–26 (Tex. 1979) (quoting W. Prosser, Handbook Of The Law Of Torts, § 46, at 293
(1971)).  “Once a conspiracy is proven,
each co-conspirator ‘is responsible for all acts done by any of the
conspirators in furtherance of the unlawful combination.’”  Id.
at 926 (quoting State v. Standard Oil Co., 130 Tex. 313, 329, 107 S.W.2d 550, 559 (1937)).

              Along
these lines, jury question 18 provided:

QUESTION 18

 

Were either of the two persons named below part of a
conspiracy that damaged ARI?

 

 

To be part of a conspiracy the defendant and another
person or persons must have had knowledge of, agreed to, and intended a common
objective or course of action that resulted in the damages to ARI.  One or more persons involved in the
conspiracy must have performed some act or acts to further the conspiracy.

 

Answer “yes” or “no” for each of the following:

 

Murphy                 yes           

 

Theriot                  yes           

 

(Emphasis added.)  Jury question 18 was predicated on a finding
that either Murphy or Theriot had breached his fiduciary duties
to ARI (jury questions 2 and 5) or had committed fraud, constructive fraud, or
conversion (jury questions 8, 10, and 12). 


              The
jury found that Theriot committed the predicate torts of breach of fiduciary
duty, fraud, constructive fraud, and conversion.  Murphy does not attack these liability
findings against Theriot for purposes of his challenge to the conspiracy
finding against him (or otherwise). 
Neither does Murphy challenge on appeal the jury’s conspiracy findings
against Theriot.  Because Murphy does not
challenge either the jury’s findings of conspiracy or its predicate tort
liability against Theriot, we must assume that Theriot both committed the
underlying torts and took acts to further the conspiracy to commit them.  Thus, the jury had to determine only that
Murphy and Theriot “had knowledge of, agreed to, and intended a common
objective or course of action that resulted in the damages to ARI,” as required
by the charge.  

 

              Murphy
does not challenge whether sufficient evidence supported the jury’s implicit
determination that he “had knowledge of, agreed to, and intended a common
objective or course of action that resulted in the damages to ARI”—i.e.,
that Murphy and Theriot had “an object to be accomplished” and “a meeting of
the minds on the object or course of action”[43]—as required by the charge and the law.[44] 
Nor does Murphy challenge the jury’s express and implied findings that
Theriot committed the four predicate torts in furtherance of the conspiracy
that it also found.  Rather, Murphy’s
legal-sufficiency challenge is premised on the view that, for him to have been
liable under a conspiracy theory under the law and the charge, the jury had to
find that Murphy himself had committed one of the underlying torts of
breach of fiduciary duty, fraud, constructive fraud, or conversion.  This is not what the law provides or the
charge instructed.  See Carroll,
592 S.W.2d at 925–26.  Under the charge’s
plain language, either Murphy or Theriot could have committed the act or
acts (i.e., one of the underlying torts) in furtherance of the
conspiracy.  Accordingly, we overrule
this portion of issue four.

              Because
Murphy does not challenge on appeal that Theriot committed one of the four
torts that the jury found Theriot to have committed and that could have formed
the predicate for the jury’s conspiracy finding against Murphy, and because we
have overruled Murphy’s sole appellate challenge to the jury’s conspiracy
finding against him, we need not reach Murphy’s legal-sufficiency challenges to
the jury’s liability findings against Murphy for breach of fiduciary duty,
fraud, constructive fraud, and conversion. 
That is, even if ARI had presented no evidence to show that Murphy
himself had committed any of these four torts, (1) the jury expressly found
that Theriot had committed all four of them (which express findings Murphy does
not challenge on appeal); (2) the jury expressly found that Murphy had
conspired with Theriot to harm ARI; (3) the jury implicitly found that Theriot
had committed these torts as acts in furtherance of the conspiracy (which
implied finding Murphy does not challenge on appeal); and (4) the jury
implicitly found that Murphy knew of, agreed to, and intended a common object
or course of action that resulted in damage to ARI (which implicit finding
Murphy does not challenge on appeal).  We
thus overrule those portions of Murphy’s appellate issues challenging the legal
sufficiency of the evidence supporting the jury’s liability findings against
Murphy himself for breach of fiduciary duty (issue five), fraud (issue four),
constructive fraud (issue four), and conversion (issue four).

C.           Legal-Sufficiency
Challenges to Actual-Damages Findings

              Under
portions of his issues challenging the jury’s liability finding on actual fraud
(issue four) and constructive fraud (issue four), Murphy also asserts that
there was no evidence that ARI suffered any actual damages.[45] 
In support, he argues only that the evidence showed that “ARI (Tex)’s
investments in RCH yielded millions [of dollars] in returns” and that “ARI
profited from its relationship with RCH and Murphy.”  Murphy does not raise this legal-sufficiency
challenge with respect to the actual damages awarded for breach of fiduciary
duty.

              With
respect to actual and constructive fraud, the jury found the following damages:

QUESTION 11

What sum of money, if any, if paid now in cash, would
fairly and reasonably compensate ARI for its damages, if any, that resulted
from such fraud?

 

In answering questions about damages, answer each
question separately. 
. . . .

 

Answer separately in dollars and cents, if any, for
each of the following:

 

1.       The
reasonable cash market value of the funds, if any, converted by Defendants;

 

ANSWER:     $837,747.00  


2.       The
reasonable cash market value of the rice, if any, misappropriated as a result
of the Defendants’ fraud;

 

ANSWER:     $2,157,347.00   

 

3.       The
reasonable cash market value of personal property other than rice and cash, if
any, misappropriated as a result of the Defendants’ fraud;

 

ANSWER:     $1,409,077.00   

 

4.       The
reasonable cash market value of ARI’s ownership interest, if any,
misappropriated as a result of the Defendants’ fraud;

 

ANSWER:     $4,404,171.00   

 

              We
first note that Murphy does not raise this legal-sufficiency challenge to the
jury’s award of actual damages for breach of fiduciary duty.  Accordingly, even if the evidence supporting
the actual-damages findings for actual and constructive fraud was legally
insufficient for the reason that Murphy argues, we would still have to uphold
the jury’s verdict because the jury found the same damages for all causes of
action, including for breach of fiduciary duty, and Murphy does not assert this
same legal-sufficiency challenge to the damages finding relating to breach of
fiduciary duty.[46] 


              In
any event, we have reviewed the entire record and conclude that sufficient
evidence, viewed in the required light,[47] supports the jury’s answers to the dollar amounts awarded as
damages for actual and constructive fraud. 
Whether and to what extent contradictory evidence also showed that ARI
generally profited from its relationship with RCH does not render the jury’s
damages findings legally insufficient.  See
Miller, 102 S.W.3d at 709 (indicating that proper standard of review for
legal-sufficiency challenge requires appellate court to uphold jury’s finding
if more than scintilla of evidence supports finding).

D.           Legal-Sufficiency
Challenges to Exemplary-Damages Findings

              In
part of issue seven, Murphy argues that the evidence was legally insufficient
to support the jury’s prerequisite findings of fraud and malice underlying its
exemplary-damages award.  

              Under
the statute applicable to this case, exemplary damages could be awarded only if
the claimant proved by clear and convincing evidence that the harm with respect
to which he sought recovery of exemplary damages resulted from, in addition to
one situation irrelevant here, fraud or malice. 
Act of Apr. 11, 1995, 74th Leg., R.S., ch. 19, 1995 Tex. Gen. Laws 108,
110 (amended 2003) (current version at Tex.
Civ. Prac. & Rem. Code Ann. § 41.003(a) (Vernon Supp.
2006)).  Under the statute applicable at
the time, malice was defined as 

(7) “Malice” means:

 

(A)     a
specific intent by the defendant to cause substantial injury to the claimant;
or

 

                             (B)     an act or omission:

 

(i)      which
when viewed objectively from the standpoint of the actor at the time of its
occurrence involves an extreme degree of risk, considering the probability and
magnitude of the potential harm to others; 
and

 

(ii)      of
which the actor has actual, subjective awareness of the risk involved, but
nevertheless proceeds with conscious indifference to the rights, safety, or
welfare of others.

 

Act of Apr. 11, 1995, 74th Leg.,
R.S., ch. 19, 1995 Tex. Gen. Laws 108, 109 (amended 2003) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7)
(Vernon Supp. 2006)).  Under case law, to
establish malice, a plaintiff has to show “more than bad faith and wrongful
conduct; the plaintiff must show that the wrongful act was of a ‘wanton and
malicious nature.’”  Solis, 951
S.W.2d at 391 (considering tort of conversion and quoting Ogle v.
Craig, 464 S.W.2d 95, 97 (Tex. 1971)).  
“Malice may be actual or implied.” 
Morey v. Page, 802 S.W.2d 779, 787 (Tex. App.—Dallas 1990, no
writ) (citing Courtesy Pontiac, Inc. v. Ragsdale, 532 S.W.2d 118, 121
(Tex. Civ. App.—Tyler 1975, writ ref’d n.r.e.)). 

              Following
the statutory definition of malice, the jury charge (jury question 19)
provided:

QUESTION 19

Do you find by clear and convincing evidence that the
harm to ARI resulted from malice?

 

“Malice” means:

 

a.       specific
intent by Murphy . . . to cause substantial injury to ARI; or

 

b.       an act
or omission by Murphy . . .

 

i.        which,
when viewed objectively from the standpoint of Murphy . . . at the
time of its occurrence, involved an extreme degree of risk, considering the
probability and magnitude of the potential harm to others; and

 

ii.       of
which Murphy . . . had actual subjective awareness of the risk
involved, but nevertheless proceeded with conscious indifference to the rights
or welfare of others.

 

“Clear and convincing evidence” means the measure or
degree of proof that produces a firm belief or conviction of the truth of the
allegations sought to be established.

 

Answer “yes” or “no” for each of the following:

 

Murphy             yes           

 

Theriot              no            

 

Question 19 was premised on an
affirmative liability finding on any of the three tort causes of action
committed by either Theriot or Murphy or a finding that Murphy or Theriot
conspired to commit one of those three underlying torts.  

              Murphy
asserts that there was legally insufficient evidence to show, by a
clear-and-convincing standard, that he committed the fraud necessary to support
a exemplary-damages award or that he acted with the malice that would allow for
a exemplary-damages award for any of the other underlying torts (including the
derivative tort of conspiracy).  However,
Murphy’s only argument in support is that “[b]ecause there was no evidence
of [Murphy’s] tort liability, there can be no ‘clear and convincing evidence’
of the fraud or malice required for the recovery of punitive damages.”
(Emphasis in original.)  

              We
disagree.  First, we have already held
that Murphy can be liable for the tortious acts of Theriot, with whom
the jury found that he conspired; thus, whether there is any evidence that Murphy
committed the predicate torts himself is immaterial.  Additionally, the jury charge predicated a
finding of malice on an affirmative finding of either the individual’s tort
liability or the individual’s having participated in a conspiracy to commit
an underlying tort.  The jury found that
Murphy conspired with Theriot.  In any
event, there is sufficient evidence that Murphy acted with malice.  For example, the following evidence, viewed
in the required light,[48] supports the jury’s implied finding
that Murphy acted with malice when he eventually converted (or conspired with
Theriot to convert) ARI’s rice and its funds held in ARI’s and RCH’s Haitian
accounts.[49] 
Upon his return to Haiti, Schwartz was greeted at RCH (of which Murphy
claimed to own the majority of shares) by armed guards, who refused him entry
into his home, the RCH plant, and the RCH sales office—all within two days of
ARI’s having fired Murphy and having voted to remove him from RCH’s board and
accounts, and against the backdrop of Murphy’s having changed his position on
whether he personally owned the RCH stock that had been issued in his
name.  The same day that armed guards
forced Schwartz away from RCH, Theriot (with whom the jury found that Murphy conspired
to convert ARI’s property) also advised Schwartz that he would need “to go
tomorrow back to the United States; just go,” at which point Schwartz was “pretty
scared.”

              We
hold that a reasonable jury could have formed a firm belief or conviction that
Murphy acted with malice in committing the acts alleged to have been conversion
or conspiracy to commit conversion.  We
thus hold that the evidence is legally sufficient to support the jury’s
implicit finding that Murphy acted with malice in converting ARI’s property or
conspiring with Theriot to convert its property.  Having determined that legally sufficient
clear-and-convincing evidence supports these implicit jury findings, we need
not determine whether legally sufficient evidence also supports the jury’s
other implicit finding that Murphy acted with malice in breaching (or
conspiring to breach) a fiduciary duty owed to ARI or the jury’s express
finding that ARI’s harm resulted from Murphy’s actual or constructive fraud.

              We
overrule this portion of issue seven.

Other Challenges to Exemplary Damages

              Under
the remainder of issue seven, Murphy challenges the award of exemplary damages
for the following further reasons: (1) the jury findings on liability for the
underlying torts and for the amount of exemplary damages were not unanimous,
allegedly in contravention of statute; (2) there was legally insufficient
evidence to support liability findings that Murphy committed fraud, breach of
fiduciary duty, and conversion, resulting in the total failure of the jury’s
actual-damages findings relating to those claims, in turn resulting in the
failure of exemplary damages because such damages cannot be awarded absent any
actual damages; (3) ARI lacked standing to sue for any of its claims, resulting
in its lack of standing to pursue exemplary damages on any claim; and (4)
legally insufficient evidence supported the jury’s findings that allowed for
the imposition of exemplary damages over the statutory cap.

              As
for Murphy’s argument (1), the exemplary-damages statute that applied to this
case did not require unanimity for such damages to be assessed.  See Act of Apr. 11, 1995, 74th Leg.,
R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 110 (amended 2003) (current
version at Tex. Civ. Prac. & Rem.
Code Ann. § 41.003(d) (Vernon Supp. 2006)).  We thus overrule argument (1) under issue
seven.  As for Murphy’s argument (2), we
have already rejected Murphy’s legal-sufficiency challenges to the jury’s
liability findings on the basis of the jury’s conspiracy finding against Murphy
and Theriot and its (unchallenged) findings that Theriot committed all of the
four underlying torts as part of that conspiracy.  Because Murphy’s challenge (2) is premised
entirely on the failure, as a matter of law, of any liability findings
applicable to him, we overrule argument (2) under issue seven.  As for Murphy’s argument (3), because we have
already held that ARI had standing to assert many of its causes of action and
that one of Murphy’s “standing” challenges was actually a “capacity” challenge,
we overrule argument (3) under issue seven. 


               Under his argument (4), Murphy actually raises
two challenges.  First, he asserts that
the jury’s “verdict on the cap-busting questions [jury questions 20, 21, and
22, i.e., the findings that he violated three Penal Code provisions that
would allow the statutory exemplary-damages cap to be exceeded[50]] was insufficient” because the jury’s
verdict was not unanimous and “a defendant can be found guilty of criminal
conduct only upon an unanimous verdict.” 
The jury charge did not require the jury to be unanimous on these
findings, and Murphy did not object below to this omission or proffer a
unanimity instruction to the court.  Therefore,
to the extent that this challenge under argument (4) can be construed as a
complaint about the jury charge, Murphy waived it.  See Tex.
R. Civ. P. 278 (“Failure to submit a definition or instruction shall not
be deemed a ground for reversal of the judgment unless a substantially correct
definition or instruction has been requested in writing and tendered by the
party complaining of the judgment.”).  To
the extent that Murphy’s first challenge under argument (4) can be construed as
something else, we also reject it.  The
law applicable to the trial of this case did not require unanimity in civil
cases for a verdict.  See Tex. R. Civ. P. 292(a), 483–84 S.W.2d
(Tex. Cases) XLVIII (1972, amended 2005) (“[A] verdict may be rendered in any
cause by the concurrence, as to each and all answers made, of the same ten
members of an original jury of twelve . . . .”).  That rule made no exception in civil cases to
the jury’s answers concerning Penal Code offenses that would allow the
statutory exemplary-damages cap to be exceeded. 
See id.  Neither did the
version of Texas Civil Practice and Remedies Code section 41.008 applicable
during the trial of this case require that such “cap busting” findings be
unanimous.  See Act of Apr.11,
1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 111–12
(amended 2003) (current version at Tex.
Civ. Prac. & Rem. Code Ann. § 41.008 (Vernon Supp. 2006)).  Murphy cites no case law requiring that, in a
civil case (as opposed to a criminal case), for purposes of
determining whether the cap on exemplary damages can be exceeded under the law
in effect at the time that this case was tried, a jury’s findings that a
criminal offense was committed must be unanimous.  Neither have we found any such
authority.  Accordingly, we reject this
first challenge of Murphy’s argument (4) under issue seven.  

              In
his second challenge under his issue (4), Murphy attacks the sufficiency of the
evidence relating to the jury findings on questions 20 to 22 because “no
probative evidence” supports the findings. 
However, Murphy’s argument concerns only questions 20 and 22,[51] and he fails entirely to discuss how
the evidence is legally insufficient to support the jury’s answer to question
21: that Murphy committed theft of property valued at $20,000 or greater.  Accordingly, any error in the jury’s answers
to questions 20 and 22 for lack of evidentiary support was rendered moot by
Murphy’s failure to challenge on appeal the jury’s answer to question 21.  We thus overrule the remainder of argument
(4) under issue seven.

Conclusion

              The
only appellate challenge of Murphy’s that we have sustained is his argument,
under a portion of issue one, that ARI lacked standing to sue Murphy for
certain causes of action that it had assigned to the indenture trustee during
bankruptcy.  Murphy argues that this
error was harmful because “it renders this Court unable to review the
sufficiency of the evidence to support the jury’s liability findings” and “prevents  Murphy from properly presenting his case to
this Court.”  In support, Murphy cites to
the Texas Supreme Court’s opinions in Crown Life Insurance Co. v. Casteel,[52] Romero v. KPH Consolidation, Inc.,[53] and Harris County v. Smith.[54]

              This
authority does not apply here.  In Casteel,
for example, the court held that “[w]hen a single broad-form liability
question erroneously commingles valid and invalid liability theories and the
appellant’s objection [to the charge error] is timely and specific,
the error is harmful when it cannot be determined whether the improperly
submitted theories formed the sole basis for the jury’s finding,” and the
judgment must be reversed and a new trial ordered.  Casteel,  22 S.W.3d at 389 (emphasis added) (considering
broad-form liability question that commingled valid liability theories with one
that was invalid because plaintiff lacked standing); accord Romero, 166
S.W.3d at 227–28 (applying Casteel to broad-form
apportionment-of-responsibility question that allowed jury to consider
liability theory that was unsupported by any evidence); Smith, 96 S.W.3d
at 234 (applying Casteel to broad-form question that commingled damage
elements, when some of those elements were not supported by legally sufficient
evidence).  We have already held that
Murphy did not properly preserve his appellate challenge that the trial court
erred in submitting jury questions on claims that only the indenture trustee
had standing to pursue in whole or in part. 
Casteel and its progeny do not apply to charge-error complaints
that have been waived.  

              Additionally,
the liability and actual-damages issues here were submitted separately, not in
broad form—with separate liability questions for each cause of action and for
conspiracy and with line-item damage questions for each cause of action
(although the court gave a single line-item damage question for both actual and
constructive fraud).  Casteel and
its progeny apply when proper and improper liability or damages theories are
submitted in a single broad-form question, i.e., when they are submitted
in such a way that one cannot determine whether the improperly submitted
theories formed the sole basis for the jury’s finding.  

              Finally,
we have already overruled Murphy’s challenges to the legal sufficiency of the
evidence supporting the jury’s separate liability findings because (1) Murphy
did not challenge on appeal the liability findings against Theriot, (2) Murphy
was found liable as a conspirator for Theriot’s commission of the underlying three
torts that ARI had standing to pursue in whole or in part, and (3) Murphy’s
only challenge to the jury’s conspiracy finding lacked merit.  Accordingly, any error that the trial court
committed in charging the jury on some claims that only the indenture trustee
could pursue did not prevent our considering the only legal-sufficiency
challenges that Murphy raised.

              Because
Casteel and its progeny do not apply for the reasons stated above, we
apply the usual harmless-error standard under Texas Rule of Appellate Procedure
44.1(a)(1).  See Tex. R. App. P. 44.1(a)(1) (providing, “No
judgment may be reversed on appeal on the ground that the trial court made an
error of law unless the court of appeals concludes that the error complained
of: . . . probably caused the rendition of an improper judgment
. . . .”); cf. Bed Bath & Beyond, Inc. v. Urista,
2006 WL 3825300, at *3 (Tex. Dec. 29, 2006) (reviewing preserved jury-charge
error to which Casteel did not apply for whether error probably caused
rendition of improper judgment).  

              Under
this standard, ARI’s lack of standing to pursue its monies-had-and-received and
conversion claims for $550,208 in funds, to pursue its actual fraud claim at
all, and to pursue its breach-of-fiduciary-duty claim to the extent that that
claim was based on pre-September 1999 actions does not require reversal of the
judgment.  We explain our conclusion
below.

              We
have held that ARI had standing to pursue its constructive-fraud claim, its
request for declaratory relief, and its breach-of-fiduciary-duty claim to the
extent that that claim was based on post-September 1999 actions, and its
conversion and monies-had-and-received claims for property taken after September
1999.  The jury found the same line-item
damages for all liability findings against Murphy except monies had and
received, including its liability findings that Murphy had committed actual
fraud, constructive fraud, breach of fiduciary duty, and conversion.  The jury also found the same damages for each
of conversion, breach of fiduciary duty, and actual or constructive fraud.[55] 
The line-item damages awarded for each cause of action included (1) the
value of funds that Murphy took,[56] (2) the value of ARI’s rice that Murphy took, (3) the value
of “personal property other than rice and cash” that Murphy took, and (4) the “reasonable
cash market value of ARI’s ownership interest” in RCH that Murphy took (the
last item being merely the sum of the first three items), for a grand total of
$4,404,171 in actual damages assessed for each cause of action except monies
had and received.  The judgment awarded
ARI $4,404,171 in actual damages, without specifying for which liability
finding that sum was awarded.  

              The
jury found the same damages for constructive fraud, which ARI had standing to
pursue fully, as it did for the one claim that ARI had no standing to pursue
(actual fraud) and for two of the claims that it had standing to pursue only in
part (breach of fiduciary duty and conversion). 
Because the jury’s liability and actual-damages findings on constructive
fraud, which ARI had standing to pursue, independently support the judgment, it
is immaterial that ARI could not recover $550,208 for some of its conversion
and monies-had-and-received claims that only the indenture trustee could have
pursued.[57] 
For the same reasons, we need not determine the effect, if any, of ARI’s
lack of standing to pursue pre-September-1999 instances of breach of fiduciary
duty.

              Accordingly,
we affirm the judgment of the trial court.

 

 

                                      Tim
Taft

                                                Justice

 

Panel consists of Justices
Taft, Alcala, and Higley.











[1]The
actual-damages portion of the judgment was rendered jointly and severally
against Murphy and another defendant below, Lawrence H. Theriot, and $10
million was assessed as exemplary damages separately against Theriot.  On December 5, 2005, however, this Court
granted Theriot’s motion to dismiss his appeal. 
Therefore, Theriot is no longer a party to this appeal.





[2]Comet
or its parent corporation, ERLY, owned 48% of ARI.





[3]Haitian
law, of which the trial court took judicial notice and concerning which it
entered fact findings and legal conclusions, required that a corporation  formed and operating in Haiti have at least
one shareholder who was a Haitian citizen. 
It was for this reason that Lamarre was made a founder and shareholder.





[4]As is
discussed below, ARI purchased Comet’s assets in 1993 and subsequently invested
millions of dollars in RCH.





[5]At
this point, RCH still had not issued any stock certificates.  Comet thus represented in the 1993 asset
purchase that “[s]hare certificates have not been issued.  Comet has paid for and will be assigned one
hundred percent of the stock.”





[6]The
jury found that Theriot was an ARI employee. 
Murphy does not contest that finding on appeal.





[7]Murphy
refers to the pre-bankruptcy ARI as “ARI (Tex)” and to the post-bankruptcy ARI
as “ARI (Del).”





[8]The
parties dispute whether ARI’s board had the authority to terminate Murphy’s
employment with RCH.





[9]Murphy
also counterclaimed, seeking damages for tortious interference with RCH’s
business relations and defamation. 
However, he never submitted jury questions on these issues, and he
non-suited his counterclaims after trial. 
Likewise, RCH intervened in the lawsuit, asserting ARI’s tortious
interference with its business relations, but it non-suited its claims over two
years before trial.





[10]Jury
question 1.





[11]Jury
questions 2, 6, and 7.





[12]Jury
questions 8, 9, 10, and 11.





[13]Jury
questions 12 and 13.





[14]Jury
question 14.





[15]Jury
question 17.  This is the exact amount
that the jury also found to be the damages that ARI suffered from Murphy’s
misappropriating ARI’s funds through fraud, constructive fraud, conversion, and
breach of fiduciary duty.





[16]Jury
question 18.  Jury question 18 was
predicated on a finding that either Murphy or Theriot had breached his
fiduciary duties to ARI (questions 2 and 5) or had committed fraud, constructive
fraud, or conversion (questions 8, 10, and 12). 
We note in passing that the jury found that Theriot had breached his
fiduciary duties to ARI and had committed fraud, constructive fraud, and
conversion.





[17]Jury
question 19.  Jury question 19 was
predicated on a finding that either Murphy or Theriot had breached his
fiduciary duties to ARI (questions 2 and 5); had committed fraud, constructive
fraud, or conversion (questions 8, 10, and 12); or had conspired to do any of
those things (question 18).  The jury
found malice by clear and convincing evidence. 
We note that the jury found that Theriot’s malice had not harmed ARI.





[18]Jury
question 23.  Jury question 23 was
predicated on a finding, made by clear and convincing evidence, that the
specified individual had either committed fraud (question 9) or had harmed ARI
as a result of his malice (question 19).





[19]Jury
questions 20, 21, and 22.  See Tex. Civ. Prac. & Rem. Code Ann. §
41.008(b), (c) (Vernon Supp. 2006); see also Tex. Pen. Code Ann. §§ 31.03(a), (e)(5) (Vernon Supp. 2006)
(theft), 32.45(b), (c)(4) (Vernon Supp. 2006) (misapplication of fiduciary
property or property of financial institution), 32.46(a), (b)(3) (Vernon Supp.
2006) (securing execution of document by deception).  Because the applicable provisions of section
41.008 that applied at the time of this suit were not substantively changed by
later amendments, we refer in the opinion to current section 41.008.  The jury found that Theriot committed two of
the alleged Penal Code offenses, whereas it found that Murphy had committed all
three offenses.





[20]Murphy
did challenge some of the matters discussed in this section for the first time
in his reply brief, but did not do so in his opening brief.  We discuss immediately below the effect of
his belatedly having asserted these and other challenges.





[21]ARI’s
appellee’s brief was filed on November 28, 2005.  Murphy’s reply brief was filed on February
28, 2005, two weeks after the parties were notified that the cause would be set
for submission on April 18, 2006.





[22]Certain
of Murphy’s appellate issues were inadvertently misnumbered.  We employ the issue numbers used in his
brief, without correction.





[23]As
discussed further below, we conclude that this particular challenge is not
truly one of standing, although we list it here because Murphy does.





[24]We
discuss in the next section the significance of the assignment of ARI’s “Litigation”
to the indenture trustee during bankruptcy.





[25]

We distinguish the authority on which Murphy relies
because none of it involved a corporate merger. 
See McAllen Med. Ctr., Inc. v. Cortez, 66 S.W.3d 227, 235–36
(Tex. 2001); Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 558 (Tex.
2000); Payne v. Edmonson, No. 01-96-00792-CV, 1999 WL 350928, at *6–7
(Tex. App.—Houston [1st Dist.] June 3, 1999, pet. denied) (not designated for
publication); Reyna v. Flashtax, Inc., 162 F.R.D. 530, 534 (S.D. Tex.
1995).





[26]In his reply brief, Murphy for the first time relies
on a third provision of the bankruptcy plan in support of his position:

 

(b)     Upon
confirmation of the Plan, any and all claims, causes of action or rights held
by Holders of Unsecured Claims against Debtor’s directors, officers or other
agents . . . shall be deemed assigned to Debtor’s estate and
transferred to the Indenture Trustee for the benefit of the Bondholders.

 

We decline
to consider this argument because it was not timely raised.  See Yazdchi v. Bank One, Tex., N.A.,
177 S.W.3d 399, 404 n.18 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).





[27]The
Petition Date was defined as the date of the bankruptcy proceedings’
commencement: August 11, 1998.





[28]Under
the bankruptcy plan, the defined term “Confirmation Order” was the July 6, 1999
order confirming the plan.





[29]Murphy
focuses on September 29, 1999—the date of the Texas-incorporated ARI’s merger
into the Delaware-incorporated ARI—as the date through which any claims were
assigned to the indenture trustee. 
However, through use of the term “Effective Date” in the assignment
provision, the bankruptcy plan made the date of assignment approximately early
September 1999.





[30]

See City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).





[31]For
example, there was evidence that the source of the funds in both RCH’s and ARI’s
Haitian bank accounts was purchase monies from ARI’s rice customers, that is,
that the funds in those accounts were customers’ cash advanced to purchase ARI’s
rice.





[32]ARI’s
own witness (Schultz) acknowledged as much when he testified that “[t]here is
at least a legal argument that maybe a half a million dollars of that 700
[thousand dollars that ARI was claiming as damages], occurred before the
bankruptcy—before we emerged during bankruptcy. 
And the argument could be made that we did assign that claim to the
indenture trustee.”





[33]See
Green Int’l, Inc. v. Solis, 951
S.W.2d 384, 391 (Tex. 1997) (“Conversion is defined as the wrongful exercise of
dominion and control over another’s property in denial of or
inconsistent with his rights.”) (emphasis added); Staats v. Miller, 150
Tex. 581, 584, 243 S.W.2d 686, 687 (1951) (“‘The question, in an action for
money had and received, is to which party does the money, in equity, justice,
and law, belong.  All plaintiff need show
is that defendant holds money which in equity and good conscience belongs to
him.’”) (emphasis added) (quoting 58 C.J.S., Money Received § 4a,
p. 913).





[34]The
bankruptcy plan defined “Claim Objections” as “the exclusive right of the
Reorganized Debtor to object to Claims.”





[35]We
discuss at the end of this opinion whether ARI’s lack of standing to pursue
some of the claims that went to the jury requires reversal.





[36]In
support, Murphy relies on the undisputed fact that RCH was ARI’s subsidiary
corporation and on authority holding that “parent and subsidiary corporations,
absent exceptional circumstances and when it is in the interest of equity to do
so, are not held accountable for the acts of the other; this is a primary
motivation for incorporation.”  Sims
v. W. Waste Indus., 918 S.W.2d 682, 686 (Tex. App.—Beaumont 1996, writ
denied).  From that premise flows the
corollary that, generally speaking, a parent corporation’s merely owning stock
in its subsidiary does not make the parent the owner of the subsidiary’s
assets.  See Drilltec Techs., Inc. v.
Remp, 64 S.W.3d 212, 217 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (stating
that parent corporation of wholly owned subsidiary does not have property
interest in subsidiary’s assets).  The
right to sue for the subsidiary’s wrongful deprivation of its property
generally belongs to the subsidiary, not to its parent corporation.  See Wingate v. Hajdik, 795 S.W.2d 717,
719 (Tex. 1990) (“A corporate stockholder cannot recover damages personally for
a wrong done solely to the corporation, even though he may be injured by that
wrong.”).  Of course, even under this
line of authority, “a stockholder [may recover] damages for wrongs done to him
individually ‘where the wrongdoer violates a duty arising from contract or
otherwise, and owing directly by him to the stockholder.’”  Id. (quoting Mass. v. Davis,
140 Tex. 398, 408, 168 S.W.2d 216, 222 (1942)).





[37]In
issue three, Murphy challenges the court’s charge, which he complains “impermissibly
allowed the jury to consider irrelevant evidence that probably resulted in an
improper judgment” because the jury charge did not distinguish between the pre-
and post-bankruptcy ARI or recognize ARI’s lack of standing to assert some
claims.  Because this issue is phrased in
terms of a jury-charge challenge, albeit based on Murphy’s concept of standing,
we consider issue three separately.





[38]The
Texas Rules of Civil Procedure require that a defendant challenging a plaintiff’s
capacity to sue raise the matter by verified pleading if lack of capacity is
not evident from the petition.  See Tex. R. Civ. P. 93(1), (2); Coastal
Liquids Transp., L.P. v. Harris County Appraisal Dist., 46 S.W.3d 880, 885
(Tex. 2001); Nootsie, Ltd. v. Williamson County Appraisal Dist., 925
S.W.2d 659, 662 (Tex. 1996).  Lack of the
plaintiff’s capacity to sue can be waived if not timely raised.  See Coastal Liquids Transp., L.P., 46
S.W.3d at 884.  Although Murphy raised in
motions for new trial the question of whether ARI, as parent corporation and
shareholder, had the capacity to recover damages for loss of RCH’s assets, he
did not do so by verified denial, and he thus waived the challenge.  See Tex.
R. Civ. P. 93(1), (2); Pledger v. Schoellkopf, 762 S.W.2d 145,
145–46 (Tex. 1988) (holding that appellants’ complaint that shareholder-plaintiff
lacked capacity to sue individually on causes of action belonging to
corporation was waived for failure to raise issue by verified denial, as
required by rule 93(2)); Willis v. Donnelly, 118 S.W.3d 10, 49 (Tex.
App.—Houston [14th Dist.] 2003) (op. on reh’g) , rev’d on other grounds,
199 S.W.3d 262 (Tex. 2006); Mackie v. Guthrie, 78 S.W.3d 462, 466 (Tex.
App.—Tyler 2001, pet. denied).





[39]But
see Williams v. Vought, 68 S.W.3d
102, 115 (Tex. App.—Dallas 2001, no pet.) (“The record in this case does not
reflect that the trial court denied, or even considered, [the appellant’s]
motion for partial summary judgment.  As
a result, [the appellant] has not preserved this complaint for our review.”).





[40]One
of Murphy’s motions for new trial raised an objection to the trial court’s failure
to distinguish the two ARI corporate entities within the jury charge, but that
objection was not timely and did not preserve his charge challenge.  See Tex.
R. Civ. P. 274 (“Any complaint as to a question, definition, or
instruction, on account of any defect, omission, or fault in pleading, is
waived unless specifically included in the [jury-charge] objections.”); see
also Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 387, 389 (Tex. 2000)
(requiring that jury charge objection be timely).





[41]It
is unclear from the record whether the jury questions that Murphy submitted
have been lost or were simply omitted from the clerk’s record.  At one point during the charge conference,
the trial court mentioned that it would “staple [the submitted question]
together and . . . I’ll mark each one refused.” Shortly thereafter,
the court mentioned that “I had previously marked the Defendants’ objections
refused and I will locate them.”  In any
event, the objections or proposed issues do not appear in our record.  ARI noted this omission in its appellee’s
brief, but Murphy did not thereafter move to supplement the record or indicate
where the document existed in the record. 
It is our burden to ensure that all items to be included by
default in the clerk’s record and that are designated by the parties for the
clerk’s record actually become part of the clerk’s record on appeal.  See Tex.
R. App. P. 35.3(a), 34.5. 
However, Murphy did not designate his refused, proposed jury charge for
inclusion in the clerk’s record, and the rules do not otherwise require that
rejected, proposed jury issues be made part of the clerk’s record.  See id.





[42]For
example, on appeal, Murphy concedes that ARI “arguably did have standing to sue
on the basis of post-merger conduct that affected its property, such as the
alleged misappropriation of its rice.” 
Likewise, we cannot know from his oral statement whether Murphy’s
written submission was an instruction concerning this assignment or was,
instead, one or more alternative liability or damages questions that somehow
recognized the assignment or its effect.





[43]Tri
v. J.T.T., 162 S.W.3d 552, 556 (Tex.
2005).





[44]In
the statement of his issues at the start of his brief, Murphy recites that no
evidence supports the jury’s implicit determination that he agreed to a course
of action or intended to act towards an object that would injure ARI.  However, nowhere in Murphy’s actual argument
does he address, brief, or discuss that specific challenge.  Accordingly, that challenge is not before
us.  See Tex. R. App. P. 38.1(h) (“The brief must contain a clear and
concise argument for the contentions made, with appropriate citations to authorities
and to the record.”); Miller v. State & County Mut. Fire Ins. Co., 1
S.W.3d 709, 712 (Tex. App.—Fort Worth 1999, pet. denied) (in considering brief
that identified four issues presented, but that briefed only two of those
issues, declining to address two issues that were not discussed in brief’s
argument section).





[45]Murphy
does not expressly raise a legal-sufficiency challenge to the jury’s
actual-damages determination (jury question 11) to the extent that that
determination was predicated on the jury’s finding of Murphy’s liability for
constructive fraud (jury question 10). 
However, jury question 11 asked the jury to find damages for actual or
constructive fraud, without distinguishing between the two, and Murphy has
challenged the legal-sufficiency of the evidence supporting question 11.  We must construe Murphy’s brief
liberally.  See Tex. R. App. P. 38.1(e), 38.9; Sterner
v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989)).  Accordingly, we deem him to have raised an
appellate challenge to the legal-sufficiency of the evidence supporting the
jury’s actual-damages determination relating to constructive fraud.





[46]We
note that we have already concluded that ARI, as opposed to the indenture
trustee, had standing to assert a breach-of-fiduciary-duty claim against Murphy
for his actions after early September 1999.





[47]See
City of Keller, 168 S.W.3d at 827.





[48]See
City of Keller, 168 S.W.3d at 827.





[49]We
note that we have already concluded that ARI, as opposed to the indenture
trustee, had standing to sue for conversion of its rice and of those funds that
were converted after early September 1999.





[50]See Tex. Civ.
Prac. & Rem. Code Ann. § 41.008(c)(10), (11), (13) (Vernon
Supp. 2006).





[51]Murphy
also argues—again, with respect only to questions 20 and 22, which concerned
the securing execution of a document (stock certificate) by deception and the
intentional misapplication of stock—that ARI had no standing to sue for any
matters relating to RCH’s stock because any wrongdoing concerning stock was
assigned to the indenture trustee. 
Again, this argument concerned only jury questions 20 and 22 and not
question 21, which did not necessarily relate only to stock.





[52]See 22 S.W.3d 378 (Tex. 2000).





[53]See
166 S.W.3d 212 (Tex. 2005).





[54]See 96 S.W.3d 230 (Tex. 2002).





[55]The
trial court submitted a single damages question for actual and constructive
fraud.





[56]The
jury’s actual-damages finding on ARI’s monies-had-and-received claim was the
same amount that the jury found for this line-item damage element under the
other four causes of action.





[57]The
jury found line-item damages for conversion, and the standing challenge that we
have sustained affects only one item of those damages.  Accordingly, if we had to reverse for this
error relating to conversion, we could simply modify the judgment to remove
$550,208 from the damages line item for “funds” and affirm the judgment as so
modified.  The same is true for monies
had and received.  But we need not
reverse for the reasons stated above.